David E. Bower (SBN 119546)
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD MORRISSEY, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        v.<br><br>KITE PHARMA, INC., ARIE BELLDEGRUN, DAVID BONDERMAN, FARAH CHAMPSI, IAN CLARK, ROY DOUMANI, FRANZ HUMER, JOSHUA A. KAZAM, RAN NUSSBAUM, JON PEACOCK, STEVEN B. RUCHEFSKY, and OWEN N. WITTE,<br><br>                              Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934** |

Richard Morrissey ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Kite Pharma, Inc. ("Kite" or the "Company") against Kite and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Kite, the "Defendants") for their violations of Sections 14(e), 14(d)(4), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(e), 78n(d)(4), 78t(a), SEC Rule 14d-9, 17 C.F.R. 240.14d-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the tender offer ("Tender Offer") by Gilead Sciences, Inc., through its subsidiary, ("Gilead") to purchase all of the issued and outstanding shares of Kite common stock (the "Proposed Transaction").

2.     On August 27, 2017, Kite entered into a definitive agreement and plan of merger (the "Merger Agreement") with the Gilead, pursuant to which each Kite stock holder stands to receive $180.00 for each share of Kite common stock they own (the "Offer Price").

3.     On September 5, 2017, in order to convince Kite stockholders to tender their shares, the Board authorized the filing of a materially incomplete and misleading Schedule 14D-9 Solicitation/Recommendation Statement (the "Recommendation Statement") with the Securities and Exchange Commission ("SEC"). In particular, the Recommendation Statement contains materially incomplete and misleading information concerning Kite's financial projections and the valuation analyses performed by the Company's financial advisor, Centerview Partners LLC ("Centerview").

4.     The Tender Offer is scheduled to expire on October 2, 2017 (the "Expiration Date"). It is imperative that the material information that has been omitted from the Recommendation Statement is disclosed to the Company's

CLASS ACTION COMPLAINT

stockholders prior to the forthcoming Expiration Date so they can properly determine whether to tender their shares.

5.     For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from closing the Tender Offer or taking any steps to consummate the Proposed Transaction, unless and until the material information discussed below is disclosed to Kite stockholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## **JURISDICTION AND VENUE**

6.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(e), 14(d)(4) and 20(a) of the Exchange Act.

7.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Kite maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

9.     Plaintiff is, and at all relevant times has been, a stockholder of Kite.

10.    Defendant Kite is a Delaware corporation and maintains its headquarters at 2225 Colorado Avenue, Santa Monica, California 90404. Kite's common stock trades on the NASDAQ under the ticker symbol "KITE".

11.    Individual Defendant Arie Belldegrun, is a director of Kite and is the President, Chief Executive Officer, and Chairman of the Board.

12.    Individual Defendant David Bonderman is, and has been at all relevant times, a director of the Company.

13.    Individual Defendant Farah Champsi is, and has been at all relevant times, a director of the Company.

14.    Individual Defendant Ian Clark is, and has been at all relevant times, a director of the Company.

15.    Individual Defendant Roy Doumani is, and has been at all relevant times, a director of the Company.

16.    Individual Defendant Franz Humer is, and has been at all relevant times, a director of the Company.

17.    Individual Defendant Joshua A. Kazam is, and has been at all relevant times, a director of the Company.

18.    Individual Defendant Ran Nussbaum is, and has been at all relevant times, a director of the Company.

19.    Individual Defendant Jon Peacock is, and has been at all relevant times, a director of the Company.

20.    Individual Defendant Steven B. Ruchefsky is, and has been at all relevant times, a director of the Company.

21.    Individual Defendant Owen N. Witte is, and has been at all relevant times, a director of the Company.

CLASS ACTION COMPLAINT

22.   Each of the Individual Defendants listed in paragraphs 11-21 along with defendant Kite are collectively referred to herein as the "Defendants."

## CLASS ACTION ALLEGATIONS

23.   Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of Kite (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

24.   This action is properly maintainable as a class action because:

a.   The Class is so numerous that joinder of all members is impracticable.  As of August 31, 2017, there were 57,410,242 shares of Kite common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public stockholders of Kite will be ascertained through discovery;

b.   There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

   i.   whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Recommendation Statement, in violation of Sections 14(e) and 14(d)(4) of the Exchange Act;

   ii.   whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

   iii.   whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to tender their shares based on the materially incomplete and misleading Recommendation Statement.

c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.   Background and the Proposed Transaction**

25.   Kite is a biopharmaceutical company engaged in the development of innovative cancer immunotherapies with a goal of providing rapid, long-term, durable response and eliminating the burden of chronic care. The company is focused on chimeric antigen receptor (CAR) and T cell receptor (TCR) engineered cell therapies designed to empower the immune system's ability to recognize and kill tumors. On March 31, 2017, Kite submitted a Biologics License Application to the FDA for its lead product candidate, axi-cel, as a treatment for patients with relapsed or refractory aggressive non-Hodgkin lymphoma who are ineligible for autologous stem cell transplant. Kite received priority review on May 29, 2017 with the Prescription Drug User Fee Act action date set for November 29, 2017. This

CLASS ACTION COMPLAINT

submission comes after positive results from Kite's ZUMA-1 pivotal trial with axi-cel in patients with chemorefractory aggressive non-Hodgkinlymphoma.

26.     Gilead is a biopharmaceutical company that discovers, develops and commercializes innovative therapeutics in areas of unmet medical need. The company's mission is to advance the care of patients suffering from life-threatening diseases. Gilead has operations in more than 30 countries worldwide, with headquarters in Foster City, California.

27.     On August 28, 2017, Kite issued a press release announcing the Proposed Transaction. The press release stated in relevant part:

> FOSTER CITY, Calif. & SANTA MONICA, Calif.--(BUSINESS WIRE)-- Gilead Sciences, Inc. (GILD) and Kite Pharma, Inc. (KITE) announced today that the companies have entered into a definitive agreement pursuant to which Gilead will acquire Kite for $180.00 per share in cash. The transaction, which values Kite at approximately $11.9 billion, was unanimously approved by both the Gilead and Kite Boards of Directors and is anticipated to close in the fourth quarter of 2017. The transaction will provide opportunities for diversification of revenues, and is expected to be neutral to earnings by year three and accretive thereafter.
>
> Kite is an industry leader in the emerging field of cell therapy, which uses a patient's own immune cells to fight cancer. The company has developed engineered cell therapies that express either a chimeric antigen receptor (CAR) or an engineered T cell receptor (TCR), depending on the type of cancer. Kite's most advanced therapy candidate, axicabtagene ciloleucel (axi-cel), is a CAR T therapy currently under priority review by the U.S. Food and Drug Administration (FDA). It is expected to be the first to market as a treatment for refractory aggressive non-Hodgkin lymphoma, which includes diffuse large B-cell lymphoma (DLBCL), transformed follicular lymphoma

CLASS ACTION COMPLAINT

(TFL) and primary mediastinal B-cell lymphoma (PMBCL). The FDA has set a target action date of November 29, 2017 under the Prescription Drug User Fee Act (PDUFA). A marketing authorization application (MAA) has also been filed for axi-cel for the treatment of relapsed/refractory DLBCL, TFL and PMBCL with the European Medicines Agency (EMA), representing the first submission in Europe for a CAR T therapy. Approval in Europe is expected in 2018. Kite has additional candidates in clinical trials in both hematologic cancers and solid tumors, including KITE-585, a CAR T therapy candidate that targets BCMA expressed in multiple myeloma.

"The acquisition of Kite establishes Gilead as a leader in cellular therapy and provides a foundation from which to drive continued innovation for people with advanced cancers," said John F. Milligan, PhD, Gilead's President and Chief Executive Officer. "The field of cell therapy has advanced very quickly, to the point where the science and technology have opened a clear path toward a potential cure for patients. We are greatly impressed with the Kite team and what they have accomplished, and share their belief that cell therapy will be the cornerstone of treating cancer. Our similar cultures and histories of driving rapid innovation in order to bring more effective and safer products to as many patients as possible make this an excellent strategic fit."

Research and development as well as the commercialization operations for Kite will remain based in Santa Monica, California, with product manufacturing remaining in El Segundo, California.

"From the release of our pivotal data for axi-cel, to our potential approval by the FDA, this is a year of milestones. Each and every accomplishment is a reflection of the talent that is unique to Kite. We are excited that Gilead, one of the most innovative companies in the industry, recognized this value and shares our passion for developing cutting-edge and potentially curative therapies for patients," said

9

CLASS ACTION COMPLAINT

Arie Belldegrun, MD, FACS, Chairman, President and Chief Executive Officer of Kite. "CAR T has the potential to become one of the most powerful anti-cancer agents for hematologic cancers. With Gilead's expertise and support, we hope to fulfill that potential by rapidly accelerating our robust pipeline and next-generation research and manufacturing technologies for the benefit of patients around the world."

## II.   Gilead's Offer Price is Inadequate.

28.   Kite, founded in 2009, is a biopharmaceutical company. The Company offers and develops cancer immunotherapeutic products and therapy designed to restore the patient's immune system to recognize and eradicate tumors.

29.   Kite's lead candidate for the treatment of aggressive non-Hodgkin lymphoma, axicabtagene ciloleucel (axi-cel) has brought hope to dozens of patients that had relapsed after running through existing treatment options.  During clinical trials underpinning applications under review in the U.S. and EU, a stunning 36% of patients achieved a complete response after 6 months and a *single infusion* of axi-cel.[1]

30.   The Offer Price is severely inadequate given Kite's strong growth prospects.  In the year leading up to the announcement of the Proposed Transaction Kite's stock price increased over 137%, going from $58.64 on August 26, 2016 to $139.10 on August 25, 2017, as illustrated by the chart below:

---

[1]   *Kite Pharma: History In The Making?*, SEEING ALPHA (March 13, 2017), https://seekingalpha.com/article/4054602-kite-pharma-history-making.

CLASS ACTION COMPLAINT



31.     Moreover, since the Offer Price was announced, analysts have identified that the premium is "deceptive" given that Kite stock already increased 210% in 2017 and that Kite's CAR-T platform is expected to generate an annual revenue of $2 to 3 billion.[2]

32.     Indeed, on August 8, 2017, Kite reported positive results for the Second Quarter for 2017. During the quarter Kite filed the industry's first CAR-T marketing authorization application in Europe for Axicabtagene Ciloleucel for Potential EU approval and launch in 2018, and submitted an investigational new drug application

---

[2]     Alex Lash, *To Be More Than Quick Splash, Gilead's CAR-T Purchase Faces Hurdles*, XCONOMY (August 28, 2017), http://www.xconomy.com/san-francisco/2017/08/28/to-be-more-than-quick-splash-gileads-car-t-purchase-faces-hurdles/.

CLASS ACTION COMPLAINT

for KITE-585, a CAR-T candidate that targets BCMA in Multiple Myeloma. Chairman, President, and CEO Belldegrun announced:

> We've continued to make significant progress on key clinical and commercial milestones in the last six months alone. With the anticipated events on the horizon for the remainder of 2017, the potential for CAR-T to become one of the most powerful anti-cancer agents for certain patients may finally be realized.

33.     In sum, the Offer Price appears to inadequately compensate Kite stockholders for their shares.  Given the Company's strong growth potential, it appears that $180.00 per share is not fair compensation for Kite stockholders.  It is therefore imperative that Kite stockholders receive the material information that has been omitted from the Recommendation Statement, so that they can make a fully informed decision concerning whether to tender their shares.

**III.   The Merger Agreement's Deal Protection Provisions Deter Superior Offers.**

34.     In addition to conducting an unreasonable sales process that resulted in an unfair Offer Price, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Kite.

35.     First, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Kite stockholders. The Merger Agreement states that the Company and the Individual Defendants shall not:

> (i) continue any solicitation, knowing encouragement, discussions or negotiations with any Persons that may be ongoing with respect to an Acquisition Proposal; (ii) (A)

CLASS ACTION COMPLAINT

solicit, initiate or knowingly facilitate or encourage (including by way of furnishing non-public information) any inquiries regarding, or the making of any proposal or offer that constitutes, or would reasonably be expected to lead to, an Acquisition Proposal (other than discussions solely to clarify the terms and conditions of such proposal or offer), (B) engage in, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any other Person any non-public information in connection with, or for the purpose of soliciting or knowingly encouraging or facilitating, an Acquisition Proposal or any proposal or offer that would reasonably be expected to lead to an Acquisition Proposal (other than to state that the terms of this provision prohibit such discussion), (C) approve, adopt, endorse or recommend or enter into any letter of intent, acquisition agreement, agreement in principle or similar agreement with respect to an Acquisition Proposal or any proposal or offer that would reasonably be expected to lead to an Acquisition Proposal (other than an Acceptable Confidentiality Agreement) or (D) take any action to exempt any Person (other than Parent and its Subsidiaries) from the restrictions on "business combinations" or any similar provision contained in applicable Takeover Laws or the Company's organizational and other governing documents; (iii) waive or release any Person from, forebear in the enforcement of, or amend any standstill agreement or any standstill provisions of any other Contract; or (iv) resolve or agree to do any of the foregoing.

36.     Additionally, the Merger Agreement grants Gilead recurring and unlimited matching rights, which provides Gilead with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) four business days to negotiate with Kite, amend the terms of the Merger Agreement, and make a counter-offer in the event a superior offer is received.

13

CLASS ACTION COMPLAINT

37.     The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that Gilead can easily foreclose a competing bid.  As a result, these provisions unreasonably favor Gilead, to the detriment of Kite's public stockholders.

38.     Moreover, the Merger Agreement provides that Kite must pay Gilead a termination fee of $356,000,000 in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal.  The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide Kite stockholders with a superior offer.

39.     Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

40.     Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that Kite's stockholders receive all material information necessary to make a fully informed decision regarding whether to tender their shares.

**IV.    The Recommendation Statement Is Materially Incomplete and Misleading.**

41.     On September 5, 2017, Defendants filed the Recommendation Statement with the SEC.  The Recommendation Statement has been disseminated to the Company's stockholders, and solicits the Company's stockholders to tender their shares in the Tender Offer.  The Individual Defendants were obligated to carefully review the Recommendation Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Recommendation Statement

misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision concerning whether to tender their shares, in violation of Sections 14(e), 14(d)(4), and 20(a) of the Exchange Act.

42.     First, the Recommendation Statement fails to disclose the unlevered free cash flow projections[3] for all sets of financial projections prepared by management. Kite discloses the unlevered free cash flow projections for *The Standalone Forecasts*, but fails to do so for *The Adjusted Forecasts* prepared by management. *See Recommendation Statement* 29-30.

43.     Unlevered free cash flows are material to the Company's stockholders. Indeed, investors are concerned, perhaps above all else, with the unlevered free cash flows of the companies in which they invest.  Under sound corporate finance theory, the value of stock should be premised on the expected unlevered free cash flows of the corporation. Accordingly, the question that the Company's stockholders need to assess in determining whether to tender their shares is clear – is the Offer Price fair compensation given Kite's expected unlevered free cash flows?  Without complete unlevered free cash flow projections, the Company's stockholders will not be able to answer this question and assess the fairness of the Offer Price.

44.     The omission of the above-referenced projections renders the financial projections and analyses included on pages 29-36 of the Recommendation Statement materially incomplete and misleading.  If a recommendation statement discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called

---

[3]     Unlevered free cash flows are used to determine a company's enterprise value. The unlevered free cash flow allows investors to ascertain the operating value of a company independent of its capital structure. This provides a greater degree of analytical flexibility and allows for a clearer picture of the value of the company overall. For this reason, unlevered free cash flows are routinely used to value a company, especially in merger contexts.

soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

45.     Further, the Recommendation Statement fails to provide material information concerning the Company's included financial projections. Specifically, the Recommendation Statement provides projections for non-GAAP (generally accepted accounting principles) metrics, including Total EBIT and Unlevered Free Cash Flows, but fails to provide line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures.

46.     When a company discloses non-GAAP financial measures in a Recommendation Statement, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method), of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

47.     Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with stockholders.  The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Kite has included in the Recommendation Statement here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant

in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[4]

48.     The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[5] Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[6] One of the new C&DIs regarding

---

[4]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

[5]     *See, e.g*., Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/22/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[6]     *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

17

CLASS ACTION COMPLAINT

1  forward-looking information, such as financial projections, explicitly requires
2  companies to provide any reconciling metrics that are available without
3  unreasonable efforts.

4      49.    In order to make the projections included on pages 29-30 of the
5  Recommendation Statement materially complete and not misleading, Defendants
6  must provide a reconciliation table of the non-GAAP measures to the most
7  comparable GAAP measures.

8      50.    At the very least, the Company must disclose the line item projections
9  for the financial metrics that were used to calculate the non-GAAP measures,
10 including Total EBIT and Unlevered Free Cash Flows.   Such projections are
11 necessary to make the non-GAAP projections included in the Recommendation
12 Statement not misleading.

13     51.    Kite regularly reconciles non-GAAP financial metrics to GAAP net
14 income (loss) in statements to investors, including their quarterly and annual
15 earnings press releases. In fact, the Company performed line item GAAP
16 reconciliations in their Second Quarter 2017 Results released on August 8, 2017:

**KITE PHARMA, INC.**
**Reconciliation of GAAP to Non-GAAP Net Loss**
**(In thousands, except per share amounts)**

|  | THREE MONTHS ENDED JUNE 30, | | SIX MONTHS ENDED JUNE 30, | |
|---|---|---|---|---|
|  | 2017 | 2016 | 2017 | 2016 |
| Net loss - GAAP | $ (109,822) | $ (64,274) | $(200,223) | $(108,189) |
| Adjustments: |  |  |  |  |
| Non-cash stock-based compensation expense | 25,163 | 19,758 | 49,241 | 34,622 |
| Net loss - Non-GAAP | $ (84,659) | $ (44,516) | $(150,982) | $ (73,567) |
|  |  |  |  |  |
| Net loss per share, basic and diluted - GAAP | $ (1.94) | $ (1.31) | $ (3.69) | $ (2.21) |
| Adjustments: |  |  |  |  |
| Non-cash stock-based compensation expense per share | 0.44 | 0.40 | 0.91 | 0.71 |
| Net loss per share, basic and diluted - Non-GAAP | $ (1.50) | $ (0.91) | $ (2.78) | $ (1.50) |
| Weighted-average shares outstanding, basic and diluted | 56,663 | 49,157 | 54,264 | 48,877 |

CLASS ACTION COMPLAINT

52.   With respect to Centerview's *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose the following key components used in the analysis: (i) the inputs and assumptions underlying the calculation of the discount rate range of 10.0% to 12.0%; (ii) the basis and underlying rationale for assuming that unlevered free cash flows would decline in perpetuity after December 31, 2032 at a rate of free cash flow decline of 50.0% year-over-year; and (iii) the actual range of terminal values utilized in the analysis.

53.   These key inputs are material to Kite stockholders, and their omission renders the summary of Centerview's *Discounted Cash Flow Analysis* incomplete and misleading.   As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id.*  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion <u>unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices</u>. The substantial discretion and lack of guidelines and standards also makes the process

CLASS ACTION COMPLAINT

> vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

54.     With respect to Centerview's *Selected Public Company* and *Selected Precedent Transactions* Analyses, the Recommendation Statement fails to disclose the individual multiples Centerview calculated for each of the companies and transactions used. A fair summary of these analyses requires the disclosure of the individual multiples for each company and transaction utilized. Merely providing the range that a banker applied to render the Implied Value Per Share is insufficient, as stockholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied valuation of the Company. The omission of the individual multiples renders the summary of this analysis set forth on page 33 and 34-35 of the Recommendation Statement materially incomplete and misleading.

55.     With respect to Centerview's premiums analysis, the Recommendation Statement fails to disclose the individual premiums used to prepare the comparative analysis. A fair summary of this analysis requires the disclosure of the individual premiums for each transaction observed. Merely providing a range is insufficient, as stockholders are unable to assess whether the banker summarized fairly, or, instead, emphasized only the figures that best present the premia in light of the Offer Price,

CLASS ACTION COMPLAINT

i.e. as low as possible. The omission of this information renders the summary of this analysis set forth on pages 35-36 of the Recommendation Statement materially incomplete and misleading.

56.     Finally, the Recommendation Statement states on page 12 that "[i]t is possible that Continuing Employees, including executive officers, will enter into new compensation arrangements with Gilead or the Surviving Corporation. Such arrangements may include agreements regarding future terms of employment, the right to receive equity or equity-based awards of Gilead and/or to receive retention bonus awards." *See Recommendation Statement* 12.     However, the Recommendation Statement fails to provide any clarification or further information regarding whether the Board's request applied to discussions about continued employment generally, or merely to amounts of compensation, or when management actually engaged in such discussions.

57.     The omitted information is particularly important to Kite stockholders given Individual Defendant Dennis' level of involvement in the negotiations of the Proposed Transaction. Indeed, it was Dennis who brought Gilead into the sales process, not Centerview.

58.     The omitted information relating to the timing, content, and parties involved in these communications concerning the post-transaction retention of Kite's management and/or directors would significantly alter the total mix of

CLASS ACTION COMPLAINT

information that Defendants have disclosed to solicit stockholder support of the Proposed Transaction. Potential conflicts of interest are particularly concerning for shareholders given the potential impact they could have on negotiations and, ultimately, the compensation stockholders stand to receive.

59.    In sum, the omission of the above-referenced information renders statements in the Recommendation Statement materially incomplete and misleading in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the expiration of the Tender Offer, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to tender their shares, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violation of Section 14(e) of the Exchange Act)**

60.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

61.    Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

62.     Defendants have issued the Recommendation Statement with the intention of soliciting Kite stockholders to tender their shares.  Each of the Defendants reviewed and authorized the dissemination of the Recommendation Statement, which fails to provide material information regarding Kite's financial projections and the valuation analyses performed by Centerview.

63.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e).  The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Recommendation Statement, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

64.     The Individual Defendants were privy to and had knowledge of the projections for the Company and the details concerning Centerview's valuation analyses. The Individual Defendants were reckless in choosing to omit material information from the Recommendation Statement, despite the fact that such information could have been disclosed without unreasonable efforts.

CLASS ACTION COMPLAINT

65.    The  misrepresentations  and  omissions  in  the  Recommendation
Statement are material to Plaintiff and the Class, who will be deprived of their right
to  make  an  informed  decision  regarding  whether  to  tender  their  shares  if  such
misrepresentations and omissions are not corrected prior to the Expiration Date.
Plaintiff and the Class have no adequate remedy at law.  Only through the exercise
of this Court's equitable powers can Plaintiff and the Class be fully protected from
the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against all Defendants for Violations of Section 14(d)(4) of the Exchange Act,
SEC Rule 14d-9, 17 C.F.R. § 240.14d-9, and Regulation G, 17 C.F.R. §
244.100)**

66.    Plaintiff incorporates each and every allegation set forth above as if
fully set forth herein.

67.    Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated
thereunder require full and complete disclosure in connection with tender offers.
Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such
> a security to accept or reject a tender offer or request or
> invitation for tenders shall be made in accordance with
> such  rules  and  regulations  as  the  Commission  may
> prescribe as necessary or appropriate in the public interest
> or for the protection of investors.

CLASS ACTION COMPLAINT

68.     SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof.

69.     In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's directors to:

> Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

70.     Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement.   The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading*."   17 C.F.R. § 244.100(b).  The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.   17 C.F.R. § 244.100(a).  As set forth above, the

Recommendation Statement omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

71.     The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omissions render the Recommendation Statement false and/or misleading.

72.     Further, by violating Regulation G, 17 C.F.R. § 244.100(a), Defendants have failed to comply with the requirements of Section 14(d)(4) of the Exchange Act.

73.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, Defendants undoubtedly reviewed the omitted material information in connection with approving the Proposed Transaction.

74.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, who will be deprived of their right to make an informed decision regarding whether to tender their shares if such misrepresentations and omissions are not corrected prior to the Expiration Date. Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT III

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

75.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

76.   The Individual Defendants acted as controlling persons of Kite within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Kite, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Recommendation Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

77.   Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement by Plaintiff to be misleading prior to the date the Recommendation Statement was issued, and had the ability to prevent the issuance of the false and misleading statements or cause the statements to be corrected.

78.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Recommendation Statement at issue contains the unanimous recommendation of each of the Individual Defendants that stockholders tender their shares in the Tender Offer.   They were thus directly involved in preparing this document.

79.   In addition, as the Recommendation Statement sets forth, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the merger agreement.  The Recommendation Statement purports to describe the various issues and information that the Individual Defendants reviewed

CLASS ACTION COMPLAINT

and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

80.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

81.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(e), 14(d)(4) and Rule 14d-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

82.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **<u>RELIEF REQUESTED</u>**

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B. Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Recommendation Statement;

C. Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D. Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: September 14, 2017

Respectfully submitted,

*/s/ David E. Bower*
   David E. Bower

David E. Bower SBN 119546
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880
Email: dbower@monteverdelaw.com

*Counsel for Plaintiff*

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, New York 10118
Tel: 212-971-1341
Fax: 212-202-7880
Email:
jmonteverde@monteverdelaw.com

*Counsel for Plaintiff*

29

CLASS ACTION COMPLAINT